Good morning, Your Honors. This is a case on the document 2 I. S. 14-0-4-3-1. The court ordered the State of Illinois plaintiff, Appoline, to return Rosalez, defendant, defendant, by the order of the Court of Appeal, to return the defendant, Mr. Fletcher E. Adler. On behalf of the plaintiff, Appoline, Ms. Victoria E. Joseph. Good morning. Good morning, Your Honors. This is the Clerk, Counsel. The onus issue in this case involves whether the trial judge violated the defendant's right to confrontation and committed plain error when she restricted defense counsel's cross-examination of the State's primary witness, Madam Billy Hawn, on two relevant topics. The right to confrontation is probably the most fundamental of the fundamental trial rights that a defendant has. Before you go on, did you preserve this issue for review? It is not preserved for review. So the issue is whether or not it was plain error and not just harmless. Okay. I'm sorry. Go ahead. So the right to confrontation is not only a trial right for the defendant to protect himself, but this is the tool that American courts use to determine the truth of a matter. The crucible of cross-examination is the method that we use here to determine which witnesses are credible and what to believe. Even though it's an important right, you're only arguing the first point of plain error, correct? That is correct, because, yes, it can be harmless, and it is not necessarily a second-pronged issue. But I am arguing the first issue of plain error. So given that importance, the defense counsel is granted wide latitude in cross-examining a witness. While the judge does have discretion to limit it, that discretion is itself limited to situations where counsel is engaging in basically abusive tactics, whether it be by harassing a witness or trying to confuse the jury or pursuing remote, uncertain theories, basically fishing expeditions. Or you end up doing a trial within a trial in certain cases. In this particular case, you were allowed to ask about the charged murder and the plea deal, the sentencing range, correct? This is correct. So then the issue you have is the death penalty question and what the psychiatrist said about him being a malinger. That is correct. Those are the two issues that you feel that you, under Chambers v. Mississippi, should have been allowed to get into. That is correct. Wouldn't those bring us to a trial within a trial, especially that issue with respect to the psychiatrist? Well, no, because the issue, particularly the issue with the psychiatrist, it was the fact we're not trying to bring in the fact that Madam Villalon was a malingerer. We're not trying to prove that or that he actually was. What you're trying to prove in that situation is that it is mostly the timing of it, because the evaluation came just before he decided to abandon his defense and, you know, plead, make a plea deal with the state and give this testimony against Tony Rosales. So the reason he's being brought in is because his defense is crumbling at that point, and this goes to his motive to incriminate the defendant and falsely. Did the jury know that he was offered 35 and that even could be reduced to minimum 20 if the prosecution felt his testimony was truthful? They were given that. Okay. That's a pretty big window. And considering it was a, what, a possible maximum 75 since death came off the table before trial, I assume. Right. That's, he's getting what some people might think, you know, a blue light special on this case. Yes, and especially given, given the facts of this case. But the, and this is where the appellate court's opinion of the people versus Perez becomes highly relevant in this case. Even though when a witness has a lot of different things wrong with his testimony, he can be impeached on. It's not enough to let defense counsel cross-examine him on most of those things and to cut off cross-examination on the rest of them simply because the witness has had enough. Or counsel has been given enough. If a witness has eight different flaws in his testimony, then counsel should be able to get into all eight of those flaws. Well, counsel got into all the sentence exposure, correct? The actual sentence exposure he did. Right. Well, the, I mean, the actual sentence exposure at the time of trial, he wasn't, he wasn't up for the death penalty. I mean, it wasn't, the state had made a decision long ago not to seek the death penalty. This is true. And it's actually, and Perez actually speaks to this as well. Because what was at issue in Perez was cases that had been, that the witness had, had been resolved before he ever even got involved in the case involving the defendant in Perez. It still goes to his state of mind because he was, we know this because it's on the record. He was in court when the prosecutor said, we need time to contemplate whether we're going to seek death against either of these defendants. So he was there and he heard that. So at one point in this case, he realized death was a possibility, even if he considered it to be remote. And even if it was later taken off of the table, which, you know, we have the prosecutor's representation on that. We don't know if or when he was ever told it was off the table. Does the fact that at some point he knows that death is on the table, does that, and then he decides, okay, I'm going to take this plea, or I'm going to seek a plea. And then if it's offered, I'll probably take it. Does, is that, is that reasonable that death versus time in prison? Or does that mean he's going to lie? I mean, isn't there a reasonable inference that you would take a lesser penalty if you knew you weren't going to die? And if that lesser penalty might at some point give you a parole, which you wouldn't get if you died? Well, I mean, that's an incentive for him to, to incriminate Tony Rosales so that he can get this deal. Well, okay, but isn't there also incentive just to take the deal because it means he has a future, wherein the death penalty doesn't mean he has a future? Right, right. Isn't there an inference that that individual, the witness, knew that death was not a possibility because he testified that death was not a possibility? The maximum sentence he was facing was 75 years? Yes. I mean, if somebody asks you what's the maximum sentence you're facing and death is on the table, death would be the maximum sentence. Yeah, that's true. And I think it's, given also the fact that Tony Rosales was told many months before the time of the deal that death was off the table for him, it's probably, it's a fair assumption that by the time he made the deal, death was off the table. But what is still relevant is that it was the prosecutor's decision, and he knew it was the prosecutor's decision, to take death off the table. Just as the state's witness in Perez knew that prosecutors had been lenient to him well before he had ever done anything against the defendant, that was still relevant in that case, and that's why this is still relevant here. So it's his subjective motive. Exactly. It's his subjective motive. And also there's another factor to this as well in that the reason, one of the reasons, probably not the only reason, because they took it off the table for Rosales as well, but one of the reasons they took it off the table was that they didn't think that Villajon was a shooter. So in his mind, in fact, I believe that there's at least one comment he makes on the stand about, I wasn't facing the shooter's spot. So he realized that that was relevant to this. And that's another factor because if he knows that it's the prosecutor who decided to take it off the table and he knows that whether or not he's a shooter is relevant to that decision, it's all the more incentive for him to give a statement saying Tony Rosales was a shooter. And it all goes beyond even what defense counsel was allowed to get into with the standard maximum sentence versus what the deal was for. So this was relevant, and it was not harassing. It was simply building off of what counsel was already doing. It was not confusing to the jury. It's pretty straightforward, really. I mean, it's a person facing scary punishment and has his defense crumble, decides to make a deal with the state. So that's not a confusing concept. And it's not a fishing expedition because we know it's all there. I mean, it's all right there in the record. We can see the comments that the prosecutor made in the preliminary hearing. This is in our record. And defense counsel's representation, the actual evaluation is not in the record, but defense counsel's representation goes unchallenged that that's what the evaluation was. So it's not a fishing expedition. So it doesn't fit any of these abusive categories where courts have allowed judges to curtail defense counsel's cross-examination. So that puts it in the wide group of topics that are allowed and cannot be curtailed. So for us to answer that proposition that any time a witness, the defendant is precluded from going into one line of cross-examination that tends to impute your witness, even though that witness is thoroughly impeached with other areas that it's a risk for? Well. Don't you look at what it was? I mean, in Thrasing, it was a crime that was committed and charged, well, it was charged and dismissed by the state. Correct? Yes. Yes. But also before the witness was a cooperating witness with the state. But there is, I believe there is a harmless error analysis here. It would be if it was preserved. And here it is a plain error analysis. So it is not 100 percent of the time that counsels curtail. So the fact that he was able to get into some things is relevant, but it still does not outweigh the fact that he wasn't able to get into other things. And I think that's the lesson for us. But on to the plain error, as I said before, we are raising that as, you know, the first prong of plain error based on the closely balanced nature of the evidence. And the evidence in this case was closely balanced. It was a shooting case. There was reliable evidence to show that it was either Tony Rezales or Manny Filihan because they're both on the passenger side of the expedition. Somebody from the passenger side fired the shot. So that much, I think, is pretty well established by the state's evidence. But then to narrow it down between those two, all the state was able to bring out was gang members, gang associates who, the two that they brought, J.J. and Pello, they were typical. They had the typical problems that you would have with these kinds of witnesses. They waffled. Their statements didn't match the testimony. Neither one of them actually said that they saw the defendant, Tony Rezales, pulling the trigger. They, you know, implied it, but not enough.  Correct. And so what they had to base the case on was Manny Filihan. And he had every problem in the world with this. And really, this whole case is him. He created the situation. He supplied the gun. He spotted the rival gang members. He insisted they go over there. He's the one that yelled at them. He directed Raul Gonzalez to where to go, where to drive. He told, if you believe him, he told Tony Rezales to shoot. He threatened to violate him. He told him he would do it himself if Tony didn't do it. And then even after the shooting, he's the one, he tells Raul where to go to clean up the car. He calls tough Tony. He has tough Tony disposing of the gun. He does absolutely everything and admits to absolutely everything except pulling the trigger. But isn't his control of the situation, as you're describing here, isn't that consistent with his self-identified role and responsibility within this particular gang? He's what, the governor, the something. Yeah, exactly. He's the governor. And this, I think, goes even further to the closely balanced nature of this hour is because when you look at JJ and the other witnesses that are in the car, who are you going to point the finger at if you're in their situation? The no-name guy with no rank or the governor? And so they're incented to point at Tony Rezales instead of the governor. Did the cousin of the victim have any insight into where the shot came from when she testified? Only that the front passenger window was open after the shooting. She did not see the shooting because she said that the window was too high, so she wasn't able to see that. And she was not able to—and she did not testify whether or not the rear window was open, whether up or down. And even by Vance Villahong's testimony, he was hanging out the window at the time of the shooting and yelling at them. Didn't Pelo, though, admit that he told the officers that the defendant reached his arm out the window and shot at the other guy? Yeah, he admitted. He testified that he didn't see it. He admitted he had told the police beforehand he was impeached for his prior inconsistent statement on that. He denied that was true on the stand. Was that evidence of self-development? I believe it was. Because he admitted that he told the police the truth. He admitted he told the police the truth after what happened on that night, correct? I think he testified that he told the police what he wanted them to hear, or what they wanted him to say. I think he also testified—and there's even at one point in the statement itself where he— Well, at our 655, he testified that he told the police the truth and they didn't make any promises or coercion. That's during direct examination. But, again, he also testified on the cross that he told them what they wanted to hear, I believe. So he's all in. It's kind of a typical situation for a witness like that. I just have one other quick question. The psychiatric evaluation evidence, the trial court didn't actually exclude that. The trial court said that you can get into that on your case if you want, and the defendant never got into it, correct? Yeah, and that's a good point. I meant to bring that up myself because the objection to that evidence was a hearsay objection. And the State, in its briefing here, makes an argument that the defense counsel didn't sufficiently make a proffer to prove its relevance. But he was talking in response to a hearsay objection, and what the judge found was not necessarily that this was irrelevant or this was an improper topic, but that it was hearsay. And that was now concededly an incorrect ruling. So what that shows, actually, is that the judge did not find this was an improper avenue for cross-examination. She only found, broadly, that it was hearsay. And I'll ask you the specific question. Does this show that it wasn't important, I guess? I don't know how the defense counsel could have gotten into that in his case in chief. If the report's hearsay, he can't call Villahog any more than he could have asked him on cross. So the implication of what the judge told counsel was that he could, I guess, bring in the doctor. That's what I said to you in the beginning. We're talking about a trial within a trial here. That's what it would become. I mean, given the judge's ruling, I would imagine that defense counsel did not anticipate that and did not have the doctor subpoenaed at the time. So as a practical matter, it would have been very difficult to do. But beyond that, other than the judge's order, it's just a very strange way to try to prove that up, and particularly because that's not what he's trying to get at. What he's trying to get at is Villahog was told he's a malingerer and then turned around and returned to state office. And the doctor couldn't testify to that. So I think that fact actually helps our case. Anything further? You'll have an opportunity. That's the time for our first question. And we're happy to be proud. Thank you. Thank you, sir. Ms. Joseph. Good morning, Your Honors. Counsel. May it please the Court. What appears to be going on in this case is the defendants conflating a plea agreement and a leniency agreement. The motive to enter the plea agreement, the people assert, is irrelevant. It was already done at the time the defendant testified. His plea itself was not pending. Even I admit to conflating these two on page 22 of my brief in talking about the leniency agreement, where I should have been talking about the other. What was pending at the time Villahog testified was the leniency agreement that included a reduction of his sentence from the 35-year sentence of his plea to 20 years if the people believed he testified truthfully. Well, the plea agreement's relevant, too, though, isn't there? It is relevant to a point, Your Honor, as to what he believed his maximum could be. As to the underlying motivations to entering a plea agreement, the people assert the judge properly excluded that. That is not the expectation and promise on which his testimony was hinging. Didn't he give a proffer before he made the plea agreement? The proffer, I believe, was made the dates of your Why do you think in 35 years, you know, with the option of going down to 20, if they didn't know what he was going to say? I mean, the whole thing seems like one ball of wax. Whether the 35 or the 35 down to 20, it all seems to be basically the same thing. But the 35 is set whether he testifies truthfully or not. There was no testimony that plea agreement was going to be invalid. His expectation and promise was if he testifies truthfully, that amount would be reduced. So regardless, I mean, the Chambers v. Mississippi gives you that opportunity to cross examine beyond the direct. If you're asking about matters concerning motive or motive to testify, correct? And the motive to testify here, the people are maintaining is the reduction of the 20 to the 20 year sentence. His testimony. But didn't he get a kind of a light sentence on them on his plea agreement? So wouldn't that be relevant? And it was discussed. The actual range of what the what he could have had to the agreement was brought out. But his motive to testify falsely, the people maintain would have been based on the further reduction. Because at the time he entered, by the time he's testifying. The plea was there. There's no evidence he was going to withdraw that plea. There's no evidence that sentence was going to change. He had a 35 year sentence. The motive for entering. And at that point, he was going to be serving his 35 years. Let me ask you a question. If there was no option to go down to 20 from 35. Are you telling me that you found sustained objections to those questions regarding the plea agreement itself? Forget about the 35 to 20. Just the 35. You got it. There's no idea that it's going to be taken away. Are you telling me those objections would be sustained and that would be correct? So are you saying that if, as Justice Brooke asked, if that second. If the second one, then his testimony would be based on the 35 year. Right. Yes. So that would be irrelevant. Because you already got it. We're saying where he already has it. The motive for entering that agreement is marginally relevant. Had that 30. Had he been needing to testify truthfully to get 35 years that there would be some relevancy. However, you also, as your honors know, the death penalty was already abolished by the time he testified. So even if you got it thinking there. How about his? How about his? His subjective. His subjective. Well, he subjectively believed his maximum was 75. He subjectively believed he was not in the shooter position. There is. Besides the he heard they were considering the death penalty. We don't know what his subjective belief was. So what might have been a reason to allow them to cross examine. To delve into what his belief was. Well, they did delve into what his belief was. They weren't allowed to delve into the area of concern. They were allowed to delve into the murder and the plea deal, but not the sex. But not the death penalty or the malingering. Correct. No, your honor. Because you also had him testify. He knew he wasn't in the shooter spot. He knew what his maximum was. So his subjective belief. Was tested as far as where he believed his maximum sentence could be. When he decided on this particular resolution for him. Did he also know about the potential reduction to 20? If his sentence was truthful or did this come up afterwards? Your honor. I'm honestly not sure for the record there. I was even confused as to when the initially they talk about. A 2000 February of 2009 was the grand jury testimony, I believe. And they said that the psychiatric evaluation came out in March. And I'm assuming that was March 2009. I don't think the record was clear. And that shortly after that, he went into negotiations on his plea. He didn't then give a statement until 2010. As far as I can see from the record, it was in August. 19th, I believe of 2010 that he actually spoke to the state's attorney. So. The record is is. Confusing at best as to when there is no testimony as to when the plea took place. I don't believe the sentencing order was on the record as to when he was actually sentenced to the 35 years. I think it was two days. Subsequent to him being determined to be in the linger. So that would have been 2009. March of 2009. That's what's unclear is when that because they just mentioned the month of March. I believe. How was the psychiatric. Interviews that are not relevant to and not subject to prosecution. Again, it went to his initial decision to enter a plea. A plea can be entered. Based on any reason. Again, the plea is not where his promise and expectation is at this point because he knows he's serving for this murder. So that goes to the reduction from the 35. Yes. So then why couldn't they get into that? Yeah. If it's relevant to the reduction. No, it's not. No, we would argue it's not relevant to the reduction because again, it went to his motive to enter. It went to his decision among many factors of which. You had. He discussed it with counsel. We didn't get into the invoking of attorney client privilege at that point, but it was part of the discussion of counsel. He received the results. He then decided to enter a plea and the jury was made aware of that. How do you go ahead? Is the witnesses testimony regarding his subjective belief or controls here? Are you precluding any defendant from exploring areas of potential bias? But the bias here is the. Bias and the motive to testify falsely. Correct. And if I, if I, if I, oh, I'm seeing I'm facing 75 years and the prosecution says, hey, you testify and I'll give you 35. And I get that deal. I'm done. I blew my 35 and then I walk into the courtroom. Are you telling me that it's not potential bias that I'm going to try and please you because you did me a solid favor? The I think the problem here in this case, as opposed to some. Is the fact that the. There is no evidence that the promise was based on that plea. That's that's where the problem spot comes is. Yes, you entered a plea. You enter it. You got you got a benefit and you explore the fact that you entered a plea and got. Sensibly a great deal. You then were able to explore further into your actual your testimony. Your testimony now is relevant to your better deal. So. How does that square with the press case? Press was talking about the fact that. A witness, a defendant. It was an error to restrict a cross examination. Where counsel was unable to explore the possibility that a witness was arrested or charged, which is. All of the case, all holds pending charges are proper areas of impeachment and exploration for cross examination. And that you could inquire into the promises and expectations. That is what. Counsel did here. He inquired into the promises and expectations. The Hong had with the state. Those were set out. The. He wasn't precluded from going into the charge. He was able to get to the charge. It does not. Perez does not stand for the proposition that once that promise and expectation is addressed, the defendant can keep digging into underlying causes. That is not what it stands for. It's they were not able to do it at all. And here. Defense counsel was able to explore the things that showed bias and a motive to testify because there was still an expectation he had of a reduced sentence. There any other questions? Oh, and there are any questions about the plane error? Argument. The people would just assert that the only contradictory evidence was pellets. Trial testimony that he said the defendant was seated in the rear of the vehicle rather than the first passenger seat that was impeached by his statement to officers. That is, the defendant in the front passenger seat seat and he pulled out the gun and shot the passenger. Almanza knew the gunshot or the window was open in the front passenger seat. She does not think the back passenger seat was open. Gonzalez testified that the defendant rolled down the window, stuck his arm out while he would not admit that the defendant shot the gun. He said that he saw a flash coming from that open window. And there is. At least an inference from the surveillance video that the defendant entered the front passenger seat when he returned to the car from the stock shop. So with the collaborating evidence, the people maintain that it is not closely balanced evidence. Thank you. Thank you, Your Honors. Mr. Thank you, Your Honor. There are some of the dates. Before you do that, you'll clear up that distinction between the plea that he entered into and the promise for a reduced sentence. Is there a distinction between the two? No. That is a new theory to me that directly contradicts Perez. I believe that theory contradicts every single case that is cited in any of the briefs. There's no distinction here. If it's passed, if a witness is paying back a past favor or if it's a state dangling a future favor, there's no distinction whatsoever. All you're allowed to get into is what motivates the witness's testimony and gratitude for past favors like in Perez where well before the case even occurred, that's still relevant. Did he know about the extended reduction on March 19th or on March 17th, between March 17th and March 18th? Was that part of the original deal or did that come later? I think it was. Because you're saying that the date is critical. He enters, he agrees to the plea on the 19th of March. He's received the psychologist, his own witnesses report on the 17th of March. So we've got that two-day window. Does he know he's going to get 35 or does he know he's got a shot at 20 as well? I don't know. I assume that the deal they struck on March 19th. And I should back up one, on the March 17th, March 19th dates, those come from defense counsel in that one little paragraph proffer. They're not contradicted. So I don't know exactly if it comes out later that it was May. But you believe it's a really short time, whether it's the month of May. That was representation and that's also what the state did not challenge. But my understanding is that whatever deal he struck is what the deal was. And I would also add, for Justice Burke, there was a proffer. It's referred to on page R620. He testified that as part of the deal, he basically gave his testimony to the state. And that was going to be the yardstick by which they were going to determine whether or not he was telling the truth and would have his 20-year sentence. On the timing, this case was charged in February of 2009. Tony Rosales was informed that the state would not be pursuing the death penalty on August 6th, 2009. As Justice said, the counsel, the March 17th, March 19th dates are coming from this tiny proffer by counsel. He didn't give a year. This case was tried in 2012. So there's March, it really doesn't make sense that it would be 2009, that if the case was charged in February, that there would be a completed psychiatric exam in March. That's generally not how things work. It's much more likely that it was 2010, 2011, maybe even 2012. Or actually, no, the trial is in February of 2012. So 2010, 2011 is far more likely, which actually, in one sense, helps the state a little bit because it does show, it does support what they said in the trial court that death was taken off the table many months before the exam. But like I said, what really matters is that it was taken off the table. It was dangled and then taken off the table and in front of him, and he was able to view that this was something that was within the state's power with respect to this case, which would make him that much more likely to want to point the finger at somebody else. But Ms. Joseph said that the death penalty was abolished well before he took the stand. That's true. Well before he was made his offer. That is true. So how is that not relevant? I mean, how would you think he was going to get the death penalty? Well, I'm pretty sure, I don't think that anybody is claiming that while he's sitting on the stand, he's thinking, I can get death in this case. No, but while he was taking the plea or giving a proffer, he couldn't have thought he was going to get death. Well, depending on the year, we don't know at that time. And even back to Perez, the witnesses' cases were dismissed. They could not even be revived. So he had to face no risk on those other cases. It was basically potentially paying back a past favor. That's why this is still relevant here. It's still something that was out there in the past with respect even to this case. And it was taken off the table at the time when there was a death penalty by the grace of the prosecutor, and at least in part because the prosecutor didn't think that he was assured. So it's all motivation for him to make sure the prosecutor keeps thinking he's not assured. Thank you. Thank you, Your Honors. That's the end of the trial. Thank you so much. Thank you, folks, for your time here this morning. We appreciate your arguments. We will take this case under consideration and render a decision. Of course, we'll be in brief recess.